UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| SUNTRUST MORTGAGE, INC., <br><br> Plaintiff, <br><br> v. <br><br> NORTH SHORE BANK, <br><br> Defendant. | Action No. 3:14-CV-385 |

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion" or "SunTrust's Motion") (ECF No. 26) and Defendant's Motion for Summary Judgment ("Defendant's Motion" or "North Shore's Motion") (ECF No. 23). For the reasons set forth below, Plaintiff's Motion is hereby GRANTED and Defendant's Motion is DENIED.

**I.     BACKGROUND**

   **a.  *Statement of Facts*[1]**

On September 23, 2004, SunTrust Mortgage, Inc. ("SunTrust") and North Shore Bank, FSB ("North Shore") entered into a Correspondent Loan Purchase Agreement (the "Agreement") (Compl. Ex. A). SunTrust's Correspondent Seller Guide (defined in the Agreement as the "Manual")[2] is incorporated by reference into the Agreement. Under the Agreement, North Shore agreed to sell mortgage loans to SunTrust and SunTrust agreed to purchase mortgage loans from North Shore, subject to the terms and conditions of the Agreement. Specifically, North Shore is responsible for the accurate preparation and completion of the loan application packages and to ensure they are in full compliance with the terms of the Agreement and the

---

[1] The parties filed a Joint Stipulation of Uncontroverted Facts ("Fact Stip.") (ECF No. 22) on December 22, 2014. The instant statement of facts includes both stipulated facts as well as facts gleaned from the parties' briefs.
[2] *See* Mem. in Supp. of Pl.'s Mot. Ex. C ("EZ Options Loan Program").

1

Manual. Pursuant to paragraph 22 of the Agreement, North Shore agreed to indemnify SunTrust against any all claims or losses resulting from, *inter alia*, a breach of the Agreement.

North Shore originated, underwrote, and closed a Mortgage Loan to Therese Hounsell (the "Loan") in the principal amount of $181,600.00, secured by a mortgage on property located at 4926 Harris Avenue, Sarasota, Florida (the "Subject Property").[3] On November 14, 2006, SunTrust paid North Shore $2,724.00 to purchase the Loan. The Loan was sold to SunTrust pursuant to the Manual's "No Ratio" documentation option. SunTrust also paid a service release premium to North Shore for the Loan in the amount of $1,816.00. Additionally, as part of the closing, SunTrust charged Hounsell $245 to review the Loan Closing Package to ensure that the Loan file contained all of the required loan closing documents and security instruments.

SunTrust, as servicer of the Loan, subsequently completed a Forbearance Agreement with Hounsell, allowing for "non-payment" of four payments, September 2008 to December 2008. Additionally, SunTrust completed a Loan Modification Agreement on December 22, 2008, which increased the principal amount of the loan, extended the maturity date and modified the interest payments.

On December 26, 2006, SunTrust sold the Loan to the Federal National Mortgage Association ("Fannie Mae"). SunTrust allegedly made its own warranty to Fannie Mae that the Loan met the guidelines as of the date of the sale. Hounsell subsequently defaulted on her payment obligations for the Loan.

On November 15, 2012, SunTrust received a Loan Repurchase Notice from Fannie Mae demanding that SunTrust repurchase the Loan due to insufficient documentation of Hounsell's assets in the loan file. (*See* Mem. in Supp. of Pl.'s Mot. Ex. B.) Upon receipt of this Notice, SunTrust conducted its own review of the Hounsell Loan file and determined that it was not underwritten in accordance with SunTrust's underwriting guidelines.

---

[3] North Shore closed on a second loan to Therese Hounsell in the principal amount of $45,400, secured by the same property. Hounsell thus paid a total of $227,000 to purchase the Subject Property.

According to the HUD-1 Settlement Statement (*id.* at Ex. E), Hounsell paid $1,201.12 to close the Hounsell Loan, made up of a $1,000 earnest money deposit check on the sale contract for the Subject Property (the "Earnest Money Deposit") and $201.12 in funds brought to closing (the "Closing Cash") (collectively, the "Funds to Close"). SunTrust alleges that because the funds from the Earnest Money Deposit were necessary to close the Loan, the Manual required that North Shore verify and document that the Earnest Money Deposit cleared the drawer's account. Additionally, because the Closing Cash was necessary to close the Loan, SunTrust alleges that the Manual required that North Shore verify and document the source of the funds comprising the Closing Cash. Although the parties do agree that the loan file contained a copy of the $1,000 check, the Loan file submitted by North Shore to SunTrust at the time North Shore sold the loan to SunTrust did not contain any other documentation. Furthermore, Hounsell's Uniform Residential Loan Application represented that Hounsell had liquid assets of $10,839.40 (the "Liquid Assets"). (*See id.* at Ex. F.) SunTrust alleges that the Manual also required North Shore to verify the Liquid Assets; however, the Loan file did not contain such documentation either.[4]

On November 21, 2012, SunTrust notified North Shore of Fannie Mae's repurchase request regarding the Hounsell Loan and requested that North Shore provide SunTrust with the missing documentation to persuade Fannie Mae to withdraw the repurchase request. (Mem. in Supp. of Pl.'s Mot. Ex. G; Def.'s Mem. in Supp. of Mot. Ex. 2(I).) North Shore did not provide SunTrust with any new documentation, but rather claimed that it reviewed the loan file and it was their "recollection that this was a no doc program that didn't require asset verification." (Mem. in Supp. of Pl.'s Mot. Ex. H.)

On November 29, 2012, SunTrust sent a letter to Fannie Mae that stated "[t]he borrower satisfactorily met the EZ Option guidelines . . . . According to the EZ Option guidelines, the borrower was not required to document the $1,201 of funds used to close the subject mortgage."

---

[4] North Shore contends that eleven days before closing, North Shore received a three-page fax from AIG verifying that Hounsell had $10,839.40 in three accounts.

(Def.'s Mem. in Supp. of Mot. Ex. 2(J).) By letter dated January 16, 2013, Fannie Mae rejected SunTrust's arguments. (*Id.* at Ex. 2(K).) SunTrust was given until January 31, 2013 to appeal the Fannie Mae decision. (*Id.*) SunTrust did not appeal Fannie Mae's letter and did not inform North Shore about the deadline for such appeal. (*Id.* at Ex. 2 ¶ 68, 69.)

On April 16, 2013, SunTrust incurred a loss on the Hounsell Loan when it paid $248,620.92 to Fannie Mae to repurchase the Loan. On May 17, 2013, SunTrust notified North Shore of its obligation to repurchase the Hounsell Loan from SunTrust. (Mem. in Supp. of Pl.'s Mot. Ex. I; Def.'s Mem. in Supp. of Mot. Ex. 2(L).) On May 28, 2013, North Shore emailed SunTrust asking for a breakdown of the repurchase amount "so that we [sic] set up this account online to reflect current servicing data" and that the repurchase needed to occur "no later than the end of next week (May 31st)." (Def.'s Mem. in Supp. of Mot. Ex. 2(N).) On that same day, the Subject Property was sold to a third party buyer through a pre-arranged short sale for $80,000.00, with net sale proceeds of $67,285.53 credited towards the unpaid balance of the Hounsell Loan. On June 6, 2013, SunTrust wrote to North Shore, informing North Shore that the Subject Property had been sold through a short sale and SunTrust demanded payment of $183,151.39. (Mem. in Supp. of Pl.'s Mot. Ex. J.)

### b. *Procedural Posture*

SunTrust filed its Complaint against North Shore on May 30, 2014 in this Court pursuant to 28 U.S.C. § 1332. The one-count Complaint alleges breach of contract and seeks to enforce SunTrust's contractual rights to be indemnified for losses sustained on the Loan purchased from North Shore. SunTrust seeks damages in the amount of $183,151.39, an award for attorneys' fees, as well as all pre-judgment and post-judgment interest permitted by law.[5] The parties attended a settlement conference with Magistrate Judge David J. Novak on December 12, 2014. However, the parties failed to settle their claims.

---

[5] SunTrust seeks prejudgment interest at the legal rate of 6% set by Virginia Code § 6.2-302 from the date of its June 6, 2013 demand latter, and post-judgment interest from the date of judgment in accordance with 28 U.S.C. § 1961.

A bench trial was scheduled to begin on February 17, 2015. Pursuant to this Court's Pretrial Order (ECF No. 19), the parties timely filed their present Motions for Summary Judgment on January 8, 2015. Once the issues were fully briefed, the Court held a hearing on February 5, 2015.

## II. LEGAL STANDARD

When faced with cross-motions for summary judgment, the Court applies the same standard as that applied to individual motions for summary judgment. *See Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). The Court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Id.* at 523 (internal citations and quotations omitted).

A motion for summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If there is no genuine dispute as to any material fact, it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted). However, if the court finds that there *is* a genuine issue of material fact, the motion must be denied. 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2720 (3d ed. 2011).

A court must look to the specific facts pled to determine whether a triable issue exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The moving party bears the burden of establishing the nonexistence of a triable issue of fact by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325 (internal quotation marks omitted). "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict." *Anderson*, 477 U.S. at 252.

5

A district court must "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Rossignol*, 316 F.3d at 523 (internal quotation marks and citations omitted). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates the other party should win as a matter of law." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006). Thus, if the nonmoving party's evidence is only colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 at 249–50.

## III. DISCUSSION

SunTrust's Motion straightforwardly argues that North Shore breached the Agreement by refusing to indemnify SunTrust for losses resulting from North Shore's failure to verify and document Hounsell's assets as required by SunTrust underwriting guidelines. North Shore's Motion argues that it is entitled to summary judgment for four reasons: (1) SunTrust's claims are disingenuous and patently false because SunTrust admitted to Fannie Mae in writing that the loan satisfied the guidelines and "the borrower was not required to document the $1,201 of funds used to close the subject mortgage;" (2) SunTrust's claims are meritless because the loan in fact met the guidelines; (3) any claims against North Shore were released when SunTrust modified the loan on December 8, 2008, caused the property to be sold at a short sale on May 28, 2013, and released the borrower from liability; and (4) SunTrust breached two provisions of the Loan Agreement and the implied covenant of good faith and fair dealing, thereby precluding its claims against North Shore. Because the second claim in North Shore's Motion encompasses the identical arguments defined in SunTrust's Motion, the Court need only address North Shore's Motion to resolve the full dispute.

//

**(1) North Shore's Claim 1: SunTrust is Bound By Its Unequivocal and Written Admission to Fannie Mae That The Borrower "Satisfactorily" Met The Loan Guidelines**

In SunTrust's response letter to Fannie Mae's repurchase demand, SunTrust states that "[t]he borrower satisfactorily met the EZ Option guidelines" and "the borrower was not required to document the $1,201 of funds used to close the subject mortgage." (Def.'s Mem. in Supp. of Mot. Ex. 2(J).) North Shore now seeks to estop SunTrust from asserting an inconsistent position with such statements. North Shore relies on *Burch v. Grace St. Bldg. Corp.*, 191 S.E. 672 (Va. 1937) to support its proposition. In that case, the Virginia Supreme Court held "[a] litigant is estopped from taking a position which is inconsistent with one previously assumed, either in the course of litigation for the same cause of action, or in dealings *in pais*." *Burch*, 191 S.E. at 677.

In their briefs, the parties' disagreement is centered on whether federal or state law controls, as the Agreement contains a choice of law provision stating that it is "governed by the internal law of the Commonwealth of Virginia." (Agreement at ¶ 30). However, it became apparent at the hearing that the parties' actual dispute lies in the interpretation of *Burch*. SunTrust interpreted *Burch* as referring to the doctrine of judicial estoppel and accordingly argued its position as to judicial estoppel in its briefs submitted to the Court. But at the hearing North Shore contended that it was not relying on the doctrine of judicial estoppel. Instead, North Shore relied on *Burch* for the single sentence that a party is estopped from taking inconsistent positions with those previously assumed in dealings *in pais*. *Burch*, 191 S.E. at 677. However, as Plaintiff noted and Defendant failed to rebut, no Virginia law exists about general estoppel principles barring any and all inconsistent claims.[6] Therefore, this Court will instead offer an analysis based on judicial estoppel.

"Judicial estoppel is an equitable doctrine that exists to prevent litigants from playing

---

[6] Although not referenced in recent Virginia Supreme Court cases, older cases note that "estoppel *in pais*" is the equivalent of "equitable estoppel." *Moyers Coal Corp. v. Whited*, 160 S.E.43, 46 (Va. 1931); *Thomasson v. Walker*, 190 S.E. 309, 312 (Va. 1937). But here there has been no evidence presented for a claim of equitable estoppel. *See Luddeke v. Amana Refrigeration, Inc.*, 387 S.E.2d 502, 505 (Va. 1990) (defining the elements of equitable estoppel as "a representation, reliance, a change of position, and detriment"). Therefore, Defendant could not rely on this form of estoppel either.

'fast and loose' with the courts–to deter improper manipulation of the judiciary." *Havird Oil Co., Inc. v. Marathon Oil Co., Inc.*, 149 F.3d 283, 292 (4th Cir. 1998) (citations and internal quotation marks omitted). In order for judicial estoppel to apply under federal law, "(1) the party to be estopped must be advancing an assertion that is inconsistent with a position taken during previous litigation; (2) the position must be one of fact, rather than law or legal theory; (3) the prior position must have been accepted by the court in the first proceeding; and (4) the party to be estopped must have acted intentionally, not inadvertently."[7] *Id.* In other words, "[t]he party asserting judicial estoppel should show that the other party took a contrary position under oath in a prior proceeding which the court accepted." *RTC Mortg. Trust 1995-s/N2 v. McMahon*, 225 B.R. 604, 608 (E.D. Va. 1997) (citing *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996)).

Here, Defendant cannot assert the doctrine of judicial estoppel because the statement at issue was not made during previous litigation. Rather, the statement was only written in a letter from SunTrust to Fannie Mae; it was not made under oath and the statement was not accepted by a court. Defendant admitted as much at the hearing. Therefore, Defendant's Motion as to Claim 1 is DENIED.

### (2) North Shore's Claim 2: SunTrust's Admissions to Fannie Mae Were Correct Because the Loan In Fact Met the Loan Guidelines[8]

Under Virginia law, a plaintiff asserting a breach of contract claim "must show (1) a legally enforceable obligation or agreement; (2) the opposing party's violation or breach of that obligation or agreement; and (3) injury or damages caused by that breach." *Design and Prod., Inc. v. Am. Exhibitions, Inc.*, 820 F. Supp. 2d 727, 736 (E.D. Va. 2011) (citing *Filak v. George*,

---

[7] Regardless of the parties' arguments in their briefs related to whether Virginia or federal law apply, in recent Virginia Supreme Court cases interpreting judicial estoppel, the Court has required that "the prior inconsistent position must have been *relied upon by the court or prior court in rendering its decision.*" *Virginia Elec. And Power Co. v. Norfolk Southern Ry. Co.*, 683 S.E.2d 517, 527 (Va. 2009) (emphasis added). Because the statement made by SunTrust in the November 12, 2012 letter to Fannie Mae was not relied on by any Court, judicial estoppel is inapplicable under either the federal or state standard.

[8] As stated above, because North Shore's Claim 2 and SunTrust's Motion address the same issue regarding whether the Loan met the underwriting guidelines, the parties' arguments are combined here into one analysis.

267 Va. 612, 594 S.E.2d 610, 614 (2004)). Moreover, "[f]or a breach of contract to be actionable, a party must establish a material breach." *Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1081 (E.D. Va. 2011) (citing *Horton v. Horton*, 487 S.E.2d 200 (Va. 1997)). To be material, a breach must fail "to comply with a fundamental aspect of the contract, so that the failure to perform that obligation defeats an essential purpose of the contract." *Id.*

Here, there is no dispute regarding the first element required for a breach of contract claim. The Joint Stipulation of Uncontroverted Facts expressly states that on September 23, 2004, SunTrust and North Shore entered into a Correspondent Loan Purchase Agreement. (Fact Stip. ¶ 1.) Neither party disputes the enforceability of this Agreement.

The second prong however requires greater analysis. Pursuant to paragraph 22 of the Agreement,

> Seller hereby agrees to indemnify, defend and hold harmless Purchaser . . . from and against any and all claims, losses, damages, fines, penalties, forfeitures, attorney's fees, judgments and any costs, court costs, fees and expenses relating to, arising out of, based upon, or resulting from (a) a breach by Seller of any representation, warranty, term, condition or obligation contained in or made pursuant to the Manual [or] this Agreement . . ., (b) a failure by Seller to disclose any information that renders any such representation or warranty misleading or inaccurate, (c) any materially inaccurate, incomplete, false, or misleading information by or through Seller to Purchaser, (d) any misrepresentation made by or through seller to Purchaser concerning any Mortgage Loan, or (e) Seller's ownership of or actions with respect to any Mortgage Loan.

It is uncontested that SunTrust made a demand on North Store to indemnify SunTrust for its losses on the Hounsell Loan pursuant to paragraph 22, (Fact Stip. ¶ 7), and North Shore refused that request, (*id.* at ¶ 8). Thus, the Court must only address whether North Shore's refusal to indemnify SunTrust constituted a breach of the Agreement. In other words, did North Shore commit one of the "triggering events" listed in (a) through (e) such that it would now be liable to SunTrust?

In order to answer that question, the Court must analyze whether North Shore failed to underwrite the Loan in compliance with the Agreement and Manual. The parties agree that the

9

EZ Options Loan Program contains the underwriting guidelines for the Hounsell Loan. The parties also agree that the Loan was written as a "No Ratio" Loan. North Shore argues the Loan met the underwriting guidelines for a "No Ratio" loan. SunTrust however alleges three defects related to the documentation of Hounsell's assets and funds used to close the Loan: (1) North Shore did not submit to SunTrust any documents verifying the source of the $1,000 Earnest Money Deposit or that it cleared the drawer's account; (2) North Shore did not submit to SunTrust any documentation identifying the source of $201.12 in Closing Cash; and (3) North Shore did not submit to SunTrust a written verification of deposit with two months average balance or the most recent bank statement to verify the $10,839.40 in liquid assets. (Pl.'s Mem. in Opp. at 10.)

The Court will first address SunTrust's third issue–the Liquid Assets. Fannie's Mae repurchase notice to SunTrust on November 5, 2012 stated,

> According to the HUD-1 Settlement Statement, the borrower paid $1,201 to the [sic] close the subject loan. The loan file submitted to our office contained a check made payable to the Trustee that reflected $1,000; however, there was no additional documentation to show that these funds had cleared the borrower's account. *No additional asset documentation was provided.* The failure to adequately verify sufficient funds to close rendered the subject mortgage ineligible for delivery to Fannie Mae.

(Mem. in Supp. of Pl.'s Mot. Ex. B) (emphasis added). SunTrust claims that "[t]he missing documentation for the Liquid Assets is 'asset documentation.'" (Pl.'s Mem. in Opp. at 13.) SunTrust relies on pages STM0255-256 and 275 of the Manual to support its argument that the underwriting guidelines required North Shore to verify the Liquid Assets with a "written verification of deposit with two months average balance or the most recent bank statement." (*Id.* at 12.)

As an initial matter, SunTrust's reliance on the Manual is misplaced. It is entirely unclear what SunTrust is referencing on pages STM0255-256. There is no requirement on these pages that any specific documents be provided to SunTrust in the loan file. Similarly, on page STM0275, SunTrust references the statement, "Written verification of deposit (VOD) with 2

months average balance or most recent bank statement." (Mem. in Supp. of Pl.'s Mot. Ex. C at STM0275.) But this statement hardly provides any guidance as to documentation for the liquid assets. These assets are not claimed to be part of the deposit for the loan, and thus it remains uncertain why SunTrust references this page of the Manual.

That being said, however, for the "No Ratio Option" loan the Manual does require verification of assets. (*Id.* at STM0217.) Unfortunately for North Shore, as Roberta Woodard undeniably stated, "[North Shore] do[es] not have asset verification in the loan file, other than a copy of the $1,000 earnest money check already referenced." (Mem. in Supp. of Pl.'s Mot. Ex. H.) Thus, North Shore failed to abide by the underwriting guidelines, and SunTrust is accordingly entitled to indemnification pursuant to Section 22 of the Agreement, regardless of any other alleged defects.

North Shore attempts to argue that the Liquid Assets are a non-issue as these assets had nothing to do with Fannie Mae's repurchase demand, and were not part of SunTrust's demand to North Shore on May 17, 2013. (*See* Def.'s Mem. in Supp. of Mot. Ex. 2(L).) However Fannie Mae's demand stated, "No additional *asset* documentation was provided." (Mem. in Supp. of Pl.'s Mot. Ex. B) (emphasis added). The Liquid *Assets* would reasonably be inferred in this request.

Next, with regards to the $1,000 Earnest Money Deposit check, in its opposition Plaintiff argues that "SunTrust's underwriting guidelines required that North Shore verify and document that the Earnest Money Deposit check cleared Hounsell's account." (Pl.'s Mem. in Opp. at 10.) Plaintiff cites the Manual at STM0254 for support. (*See* Mem. in Supp. of Pl.'s Mot. Ex. C. at STM0254.) STM0254 states that "[f]unds needed for closing must be verified." (*Id.*) North Shore did in fact provide a copy of the $1,000 earnest money deposit check in the Loan file submitted to SunTrust, (*see* Pl.'s Mem. in Opp. at 1 ¶ 4), and the payment appeared on the HUD-1 Settlement Statement, (*see* Def.'s Mem. in Supp. of Mot. Ex. F). But, as stated above, SunTrust is still entitled to indemnification on the liquid assets issue.

11

Finally, with regards to the $201.12 Closing Cash, SunTrust argues that the Manual required North Shore to document the source of the Closing Cash. (Pl.'s Mem. in Opp. at 11.) Again, SunTrust cites STM0254 in support of its argument that "[f]unds needed for closing must be verified." The parties agree that the HUD-1 Settlement Statement identifies the $201.12 payment as "Cash from Borrower," (Def.'s Mem. in Supp. of Mot. Ex. 2(F)), and the settlement statement identifies the borrower as Therese M. Hounsell, (*id*). But, as SunTrust argues, the HUD-1 settlement statement appears in every loan file. This statement does not "verify" the Closing Cash, but only evidences that the transaction occurred. *See* Black's Law Dictionary (9th ed. 2009) (defining the term "verify" as "[t]o prove to be true; to confirm or establish the truth or truthfulness of; to authenticate").[9] For all of the aforementioned reasons, North Shore's Motion as to Claim 2 is DENIED.

**(3) North Shore's Claim 3: Any Claims Against North Shore Were Released When the Loan Was Modified, the Property Sold and Hounsell Released From Liability**

North Shore relies on Virginia suretyship law in arguing that it was released from any and all liability when SunTrust modified the Hounsell Loan and subsequently conducted a short sale of the Subject Property. However, as SunTrust argues, North Shore's reliance on such law misses the mark.

"[A] surety contract is a tripartite agreement among a principal obligor, his obligee, and a surety. The surety makes a direct promise to perform the obligation in the event the principal obligor fails to perform." *First Va. Bank-Colonial v. Baker*, 301 S.E.2d 8, 11 (Va. 1983). To the contrary, "a contract of indemnity is a bilateral agreement between an indemnitor and an indemnitee in which the indemnitor promises to reimburse the indemnitee for loss suffered or to save him harmless from liability." *Id.*

---

[9] North Shore also argues that because of the "small amount of the payment," the Closing Cash "is immaterial and inconsequential." (Def.'s Mem. in Supp. of Mot. at 11.) However, regardless of the amount, the Manual required North Shore to verify "funds needed for closing." Because it is undisputed that this Closing Cash was needed to close the Loan, North Shore was required by the underwriting guidelines to verify it, and North Shore can be held responsible for its failure to do so.

As SunTrust highlights, in this case there is no tripartite relationship. North Shore has not alleged that it promised to perform the obligation of the mortgage borrower in the event the borrower defaulted. Instead, the Agreement at issue was an indemnification agreement only between North Shore and SunTrust. Thus, North Shore's suretyship argument is without merit.

As to North Shore's argument that "many other courts have agreed that an act of an indemnitee that materially prejudices the rights of the indemnitor will discharge the indemnity obligation to the extent of the prejudice," (Def.'s Mem. in Supp. of Mot. at 12 n.5) (citing, *inter alia*, *U.S. Fidelity and Guar. Co. v. Hathaway*, 394 S.E.2d 764, 767 (W. Va. 1990)), this Court declines to hold that the Virginia Supreme Court would extend the suretyship doctrine to this context. Therefore, Defendant's Motion as to Claim 3 is DENIED.[10]

### (4) North Shore's Claim 4: SunTrust Breached the Loan Agreement and the Implied Covenant of Good Faith and Fair Dealing

i. *SunTrust's Material Breach of Loan Agreement Section 10.9.1.*

Section 10.9.1. of the Agreement states, "Seller [North Shore] shall defend against any request received by Purchaser [SunTrust] for repurchase of a Mortgage Loan where the Mortgage Loan was both (a) sold by Seller to Purchaser and (b) underwritten using Delegated Underwriting authority." North Shore argues that "SunTrust breached the Agreement when it failed to *notify* North Shore of [Fannie Mae's] January 16, 2013 letter and its January 31, 2013 deadline for appeal." (Def.'s Mem. in Supp. of Mot. at 14) (emphasis added). However, the Court need not look beyond the plain language of the Agreement. *See American Spirit Ins. Co. v. Owens*, 541 S.E.2d 553, 555 (Va. 2001) (citation omitted) ("[W]here the terms of the contract are clear and unambiguous, we will construe those terms according to their plain meaning."). This section does not impose an obligation upon SunTrust to notify North Shore of a repurchase request; rather, the section only imposes an obligation on North Shore to defend such request. Moreover, as SunTrust highlights (*see* SunTrust's Resp. at 18 n.9), if the parties intended to

---

[10] Further, as SunTrust highlights, the indemnification provision in Section 22 of the Agreement survives "any purchase, sale or transfer of any Mortgage Loan or any interest therein by any of the Indemnitees, the liquidation of the Mortgage Loan, or any termination of this Agreement."

impose such a notice obligation on SunTrust, the parties would have known how to do so, as exemplified by Section 10.9.3 of the Agreement.[11]

### ii. *SunTrust's Material Breach of Loan Agreement Section 20*

Section 20 of the Agreement states, "In addition to any other rights and remedies which Purchaser [SunTrust] may have against Seller [North Shore], Seller agrees to repurchase any Mortgage Loan . . . within 10 calendar days after Purchaser's demand . . . ." The Agreement also refers to "*Seller's* repurchase *obligations* under . . . Section 20." (Agreement ¶ 20.1.) Similar to Section 10.9.1 described above, the Court need only focus on the plain language to conclude that SunTrust cannot breach this section of the Agreement. Instead, Section 20 only imposes an obligation on North Shore.

### iii. *SunTrust's Breach of the Implied Covenant of Good Faith and Fair Dealing*

"In Virginia, every contact contains an implied covenant of good faith and fair dealing." *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009) (citations omitted). To establish a claim for breach of the implied covenant of good faith, a plaintiff must prove (1) a contractual relationship between the parties, and (2) a breach of the implied covenant. *Id.* (citing *Charles E. Brauer Co., Inc. v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 386 (Va. 1996)).

"[A]lthough the duty of good faith does not prevent a party from exercising its explicit contractual *rights*, a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party." *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 156 F.3d 535, 542 (4th Cir. 1998). In sum, "[t]he case law shows two ways in which the duty of good faith and fair dealing may be breached: (1) where a party has a clear contract right, even if its exercise would arguably by arbitrary, that party is only forbidden from acting dishonestly . . .; (2) but where a party has discretion in performance, that party cannot act arbitrarily or

---

[11] Section 10.9.3 of the Agreement contains an express notice provision by stating, "Seller shall submit to Purchaser and maintain a current and accurate list of its senior management, and shall *notify* Purchaser in writing within 30 days . . . ." (Agreement ¶ 10.9.3) (emphasis added).

14

unfairly." *Stoney Glen, LLC v. Southern Bank and Trust Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013) (internal citations omitted).

In *Enomoto*, the plaintiff contracted with the defendant for a space tourism flight to the International Space Station. 624 F. Supp. 2d at 446, 447. When the defendant failed to follow through, the plaintiff sued for, *inter alia*, breach of the implied covenant of good faith and fair dealing. *Id.* at 448. In denying the defendant's motion to dismiss, the district court found that "Defendant's actions were not merely unfavorable, but actually dishonest." *Id.* at 450. The plaintiff "allege[d] that Defendant purposefully failed to provide him with a space flight and purposefully failed to inform him of the high likelihood of medical disqualification until after he had paid three or four payments that Defendant submits are non-refundable." *Id.* at 451. Thus, the Court found that "[t]hese claims are not merely claims for Defendant's unfavorable exercise of its contractual rights. [Rather] Plaintiff has alleged bad faith and unfair dealing in a contractual relationship." *Id.*[12]

Here, North Shore fails to identify any clear contractual right which SunTrust is alleged to have exercised dishonestly, and has also not provided any evidence that SunTrust acted arbitrarily or unfairly in exercising its discretion. Rather, North Shore simply states that SunTrust failed to notify North Shore on various occasions. (Def.'s Mem. in Supp. of Mot. at 17.) With this in mind, the Court does find that SunTrust breached the implied covenant of good faith and fair dealing.

## IV. CONCLUSION

For the foregoing reasons, the Plaintiff's Motion is hereby GRANTED and Defendant's Motion is DENIED.

---

[12] Defendant cites *Enomoto* for the proposition that "Courts also routinely rule a party breaches the covenant when it fails to act timely, including the failure to provide timely notice." (Def.'s Mem. in Supp. of Mot. at 17.) Defendant states, "The allegation that defendant [in *Enomoto*] failed to timely inform the plaintiff of the 'high likelihood of medical disqualification' until after he had made the non-refundable payments stated a claim for breach of the implied covenant." (*Id.*) However, as described above, the Court's holding was not centered on the issue of timeliness, but rather focused on defendant's purposeful and dishonest behavior. *See Enomoto*, 624 F. Supp. 2d at 450–51.

15

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order will issue.

_____/s/_____
James R. Spencer
Senior U. S. District Judge

ENTERED this   20th   day of February 2015.